# United States Court of Appeals for the Federal Circuit
## In the United States Court of Federal Claims
### Appeal Information Sheet

**Assigned to:**     Judge Charles F. Lettow

**Nature of Suit:**     514

**Type of Case**:     Taking - Other

**TERESA NAN LUCREE,**
        *Plaintiff,*
                v.
**THE UNITED STATES**,
        *Defendant,*

---

**Docket No**.:  14-308 C.

**Cross or Related**:  No.

**Appellant is**: Plaintiff.

**Date Judgment Entered**: July 31, 2014.

**Date of Appeal:** August 7, 2014.

**Fee**:  $505.00 paid.

*See docket sheet for defendant and plaintiff counsel representation information*

APPEAL,CLOSED,ECF

# US Court of Federal Claims
## United States Court of Federal Claims (COFC)
## CIVIL DOCKET FOR CASE #: 1:14-cv-00308-CFL
### Internal Use Only

LUCREE v. USA

Assigned to: Judge Charles F. Lettow

Cause: 28:1491 Tucker Act

Date Filed: 04/16/2014

Date Terminated: 07/31/2014

Jury Demand: None

Nature of Suit: 514 Taking - Other

Jurisdiction: U.S. Government Defendant

**Plaintiff**

**TERESA NAN LUCREE**      represented by    **Frank A. Lukasik**
1550 Killingsworth Way
Apartment 246
The Villages, FL 32162
(352) 674-3637
Email: flpatlaw@yahoo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ROBERT ABBONDANDOLO**      represented by    **Frank A. Lukasik**
*TERMINATED: 07/31/2014*                             (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**THOMAS F. ADAMS**      represented by    **Frank A. Lukasik**
*TERMINATED: 07/31/2014*                             (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ANITA L. ALDUS**      represented by    **Frank A. Lukasik**
*TERMINATED: 07/31/2014*                             (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**RICHARD E. ALDUS**      represented by    **Frank A. Lukasik**
*TERMINATED: 07/31/2014*                             (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JAMIE R. HILL**                          represented by   **Frank A. Lukasik**
*TERMINATED: 07/31/2014*                                   (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOHN G. KURTZ**                          represented by   **Frank A. Lukasik**
*TERMINATED: 07/31/2014*                                   (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**DONALD R. SEPTER**                       represented by   **Frank A. Lukasik**
*TERMINATED: 07/31/2014*                                   (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**PATRICK J. SIMERI**                      represented by   **Frank A. Lukasik**
*TERMINATED: 07/31/2014*                                   (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOSEPH H. SMITH, JR.**                   represented by   **Frank A. Lukasik**
*TERMINATED: 07/31/2014*                                   (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**USA**                                    represented by   **Sonia Marie Orfield**
                                                           U. S. Department of Justice
                                                           1100 L Street, NW
                                                           8th Floor
                                                           Washington, DC 2000
                                                           (202) 353-0534
                                                           Fax: (202) 514-8624
                                                           Email: sonia.m.orfield@usdoj.gov
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/07/2014 | [10](#) | NOTICE OF APPEAL, filed by TERESA NAN LUCREE. Filing fee $ 505.00, receipt number 077056. Copies to judge, opposing party and CAFC. |

| | | (hw1) (Entered: 08/07/2014) |
|---|---|---|
| 07/31/2014 | 9 | JUDGMENT entered, pursuant to Rule 58, dismissing the complaint. No costs. (Copy to parties) (dls) (Entered: 07/31/2014) |
| 07/31/2014 | 8 | REPORTED OPINION granting 5 Motion to Dismiss - Rule 12(b)(6). The Clerk is directed to enter judgment. Signed by Judge Charles F. Lettow. (zlr) (Entered: 07/31/2014) |
| 07/24/2014 | 7 | REPLY to Response to Motion re 5 MOTION to Dismiss pursuant to Rule 12(b)(6) , filed by USA. (Orfield, Sonia) (Entered: 07/24/2014) |
| 07/07/2014 | 6 | RESPONSE to 5 MOTION to Dismiss pursuant to Rule 12(b)(6) , filed by All Plaintiffs.**Reply due by 7/24/2014.** Service: 7/7/2014.(vro) (filed by leave of the Judge ) (Entered: 07/08/2014) |
| 06/16/2014 | 5 | MOTION to Dismiss pursuant to Rule 12(b)(6) , filed by USA.**Response due by 7/17/2014.**(Snyder, Sharon) (Entered: 06/16/2014) |
| 05/14/2014 | 4 | NOTICE of Appearance by Sonia Marie Orfield for USA . (Orfield, Sonia) (Entered: 05/14/2014) |
| 04/16/2014 | 3 | NOTICE of Designation of Electronic Case. (ac7) (Entered: 04/18/2014) |
| 04/16/2014 | 2 | NOTICE of Assignment to Judge Charles F. Lettow. (ac7) (Entered: 04/18/2014) |
| 04/16/2014 | 1 | COMPLAINT against USA (COM) (Filing fee $400, Receipt number 076518) (Copy Served Electronically on Department of Justice), filed by All Plaintiffs.**Answer due by 6/16/2014.** (Attachments: # 1 Exhibit, # 2 Civil Cover Sheet)(ac7) (Entered: 04/18/2014) |

ORIGINAL

Appeal

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| TERESA NAN LUCREE, | ) | |
| | ) | **FILED** |
| Plaintiffs, | ) | AUG  7 2014 |
| | ) | U.S. COURT OF FEDERAL CLAIMS |
| v. | ) | |
| | ) | No. 14-308 C |
| THE UNITED STATES | ) | |
| | ) | |
| Defendant, | ) | |

Frank A. Lukasik

1550 Killingsworth Way, Apt. 246

The Villages, FL 32162

352-674-3637

Attorney for Plaintiffs

1

## TABLE OF AUTHORITIES

**STATUTES:**

**An Act to Amend the Patent and Trademark Laws**

   (Pub. L. 96-17),

35 U.S.C.

28 U.S.C. 1491

28 U.S.C. 1498

**CONSTITUTION:**

Article 1, Section 8, Clause 8

**GOVERNMENT REPORTS AND RECORDS:**

Prepared Remarks of James E. Rogan, February 6, 2002.......

Testimony of Nathan P. Myhrvold before Committee on the

   Judiciary, 28 April 2005

## INTRODUCTION

This Appeal is based primarily on a "Logical Conclusion" based on the Patent Laws.  To fully understand this logical reasoning, following is a section taken from the original complaint.

To most adequately describe the Patent System, following are some quotes from remarks given by James E. Rogan, Undersecretary of Commerce for Intellectual Property and Director of the U.S. Patent and Trademark Office (USPTO), February 6, 2002, at hearings on Competition and Intellectual Property:

"The understanding of the patent system begins with the recognition that patents are a form of property (emphasis added) anticipated by the United States Constitution"...

"In granting an inventor a temporary patent, the public is given permanent (emphasis added) and valuable consideration (emphasis added).  Inventors must fully disclose their invention for all the world to see (emphasis added), replicate and make improvements thereon.  The patent must describe and disclose the invention so completely that it would allow someone of ordinary skill in the art to replicate the invention without difficulty"....

"In analyzing the economic effects of the patent system, commentators often ignore this quid pro quo that society obtains from inventors in exchange for the temporary patent grant"...

3

"A patent is not simply a grant of economic advantage, nor is it a form of economic regulation (emphasis added). A patent must be earned through the satisfaction of objective criteria, as well as by appropriate disclosure of the innovation. When an inventor applies to the USPTO for a patent, the application is examined to ensure that under the patent Act the claimed invention is new, useful and non-obvious (emphasis added) when measured against all previous inventions".

This is contrary to the above quoted statement by the Director of the USPTO:

"A patent is not simply a grant of economic advantage, nor is it a form of economic regulation".

Thus, although the Public is given permanent and valuable consideration, (mentioned above), the Congress has authorized the Patent Office to rescind the protection provided by the patent for non-payment of a fee which is attached after four years and increases every four years thereafter.

It is inconceivable that the Defense would argue that "plaintiffs had no property to be taken" (see James E. Rogan's testimony above).

Our country has a proud tradition of fostering inventions going back to framing of our Constitution which enabled Congress to pass laws in 1790 granting rights to inventors (Article 1. Section 8). This creativity has been a principal foundation of our economic strength.

4

They don't need the Government to take away the only protection that they may have from domestic and foreign competition. Canceling the right to exclude others from making, using, or selling the invention opens the U.S. market to foreign manufacturers such as China, Taiwan and Japan.

As stated in the instant dismissal:

Given the broad terms of the Intellectual Property Clause of the Constitution, any condition Congress imposes on Patents "need only be <u>rationally</u> related to the promotion of <u>progress in science and the useful arts</u> to survive judicial scrutiny". This Appeal is based primarily on the fact that Congress did not pass Legislation which is "<u>Rationally</u> related to the promotion of Progress in Science and the Useful Arts <u>in the United States</u>". "Nothing in the Constitution forecloses Congress from requiring such fees which <u>rationally</u> relate to the promotion of scientific progress (in China, and other foreign countries).

To prove that Congress has erred in enacting the Maintenance Fee section, a quick look at Attach. 1 and Attach. 2, will prove the point. Adding a Maintenance Fee may not be Unconstitutional, but "<u>lapsing</u>" the Patent and taking the Patentee's property does not increase "<u>progress in science and the useful arts</u> in the United States.

If a Foreign manufacturer wants to find "Royalty Free" Patents, it can look at the Official Gazette of the USPTO which lists all Patents that expire every week (Attach. 1. in the Complaint).

A review of the "Study" (Attach. 2.) in the Complaint, shows that for Small Business, only **50%** survived the First Stage (3.5 yrs.), **27%** survive the Second Stage (7.5 yrs.), and **12%** survive the Third Stage (11.5 yrs). It was also found that only **19%** of the issued Patents survive for 17 years.

Plaintiffs did not dispute the fact that Congress has enacted laws requiring that Maintenance Fees be paid in order to maintain a patent. Plaintiffs do challenge the authority of the Congress to establish fees for "Maintaining" the patent when the Patent Office does nothing to "maintain" except to pay the cost of collecting the fees. Once the patent is issued, the inventor has satisfied the responsibility of "fully disclosing their invention for all the world to see, replicate and make improvements thereon" as stated by James E. Rogan (above). The Patent Office does not and cannot withdraw the publication to the whole world for non-payment of the fee which causes the patent to lapse. Using the Congress' logic of "destroying" the patent for nonpayment of the maintenance fee, a County could burn down a house for non-payment of property taxes.

The Supreme Court has clearly expressed that the text of the Patent Clause limits Congress' authority. In Graham, it specifically held that:

> The [Patent Clause is both a grant of power and a limitation. This qualified authority ... is limited

**GRAHAM,** 383 U.S. at 5:

> to the promotion of advances in the "useful arts."
> ... The Congress in the exercise of the patent power
> may  not overreach the restraints imposed by the stated
> constitutional purpose".

The Constitutional purpose is to promote the progress of useful arts. Following this precedent, the Supreme Court in **Elfred v. Ashcroft** applied two separate tests to determine whether the legislation at issue passed constitutional muster. 537 U.S. 186 (2003) First, the Supreme Court determined whether legislation was "categorically beyond Congress' authority under the Copyright Clause" based upon "text, history and precedent. **Id. at 199-204.** Second, the Supreme Court determined whether Congress had a rational basis for the conclusion that the [legislation extending the term of copyright] promotes the "Progress of Science". **Id.** at 213.

The same analysis should apply to the legislation at issue in this case.

Congress has added a new, unconstitutional test, for patentability:

> "it must be **commercially successful**" within three
> and a half years and, a maintenance fee must be paid
> to continue supporting the USPTO in order to retain
> the right of **exclusivity** granted by the patent".

The **commercially successful** test is based on European Law and not the United States Constitution and is a condition precedent to retaining exclusivity granted by the issuance of

7

the patent based on the Congress' **Constitutional Authority.**
To meet the **commercially successful** test added by Congress to
keep exclusivity, the inventor must spend a considerable amount
of funds to further develop the invention to be marketable and
the marketing effort must be successful.  The maintenance fee
requirement only allows three and a half years to be successful
or the patent lapses.  Without the exclusivity granted by the
patent, the inventor cannot approach potential licensees nor
investors to market the invention.  Every Tuesday, The Official
Gazette of the USPTO lists 25 pages of the patents which **lapsed**
that week (approximately 1,200).

In **Miguel Figueroa v. United States**, (No. 01-457C), the
plaintiff alleged that:

> "Congress' practice of using money generated from
> application fees paid to the USPTO for purposes other than
> supporting USPTO operations (1) violated the Intellectual
> Property Clause of the Constitution, (2) worked an unlawful
> taking, and (3) constituted an illegal direct tax"

This Court held:

> "Congress is entitled to great deference under the
> Necessary and Proper Clause when it legislates under
> its Intellectual Property power.  Any intellectual
> property law Congress passes need only survive the
> limited scrutiny of the rational basis test as to
> whether: <u>'it promotes the progress of science and the
> useful arts'</u>.

8

The instant case _does_ involve the Intellectual Property
power of the Congress because the maintenance fees do not

**"promote the progress of science and the useful arts"**
and it is properly an issue which should be decided by the Court.
As a matter of fact, the maintenance fees degrade the **"progress
of science and the useful arts"** for the reasons discussed above.

### CONGRESS' PRACTICES HAVE RESULTED IN AN
### UNCONSTITUTIONAL TAKING OF PRIVATE PROPERTY
**The Legislative Authority Emphasized By Defendant Is Demonstrably
Erroneous.**

The Defendant has not cited any decisions to support
Congress' authority to enact legislation to cause a patent to
"expire" for non-payment of a fee.  A patent does not "expire"
(cease, terminate) until twenty years after filing or seventeen
years after Issue.  The Congress realized that once a patent
is issued it has a definite life period so a new term was used,
**"lapse"** (the termination or failure of a right or privilege
through neglect to exercise _it_ within some limit of time").
Apparently **"it"** covers the marketing of the invention _after_
the patent issues.  The two principal decisions cited by
Defendant, **Guiliani v. United States** and **Boyden v. Commissioner
of Patents** pertain to Congress' power to set **"Issue Fees"** and
to raise **"Issue Fees"** at any time (before the patent issues).
Both of these decisions pertain to the _issuance_ of the patent
and not after the patent issues.  Plaintiff is not challenging
the right of Congress to impose conditions on patent
applications, including the requirement that fees be paid before

9

a patent is issued.   Congress has exceeded its authority by applying conditions after the patent issues (**Exaction**).

Putting the patent in the public domain is equal to the taking of property under 28 U.S.C. 1491 (the Government and the public can use the invention without paying royalties). The enforcement of patent rights is, and should be, in the jurisdiction of the Courts.

Query, how does the lapse of a U.S. patent "promote the useful arts" as required by the Constitution?

**Inventors and Patent Owners pay their Fair Share of Fees to Support Patent Office Operations.** For over 200 years, taxpayers paid for most of the Patent Office costs in exchange for the right to use the invention after the Patent expires.

The inventor pays a filing fee on application for the patent.  After the application is examined and allowed, an issue fee is required.  During the examination process other services are required and charges are applied.  For example, current filing fee for a small entity is $420.00 and the issue fee is $675.00.  The fees for other than small entities is double the small entity fee.  If the inventor does not submit a "non-publication" request, a $300.00 fee is due at the time of issue.  In addition, the inventor pays the cost of preparing the application including the cost of formal drawings.  The inventor has completed all of the requirements of the Constitution to have a patent issued.  The maintenance fees due at 4, 8 and 12 years are used to pay the expenses of future

10

applications and are unconstitutional.

**Plaintiffs Had a Property to be Taken Independent**

**of the Fee condition that they Failed to Meet**

The Defendant stated that:

"The patent privilege does not exist independent of

the fees upon which Congress conditioned the

privilege".

The patent privilege is based on the submission of a full

disclosure so completely that "it would allow someone skilled

in the art to replicate the invention without difficulty" (Mr.

Rogan above).  He has also stated "patents are a form of property

anticipated by the United States Constitution".  Each of the

plaintiffs complied with the patent requirements and have an

issued Patent.  It is not clear what the basis is for Defendant's

statement that "Plaintiffs had no "property" that was taken.

In neither of the cases cited by Defendant, with respect to

the "Taking Clause" (e.g. **Commonwealth** and **Longshore**), does

the Government "take property".

**CONGRESS AND THE USPTO ARE NOT PROTECTING SMALL**

**BUSINESS AND INDEPENDENT INVENTOR'S RIGHTS**

Small business depends on the Patent system much more than

large corporations.  Most of the patents obtained by large

corporations are for defensive purposes.  The longer an

application is pending, the protection by patent pending is

in force.  Once the patent issues, the maintenance fees are

tax deductible.  If the patent lapses, they are still protected

11

## CONCLUSION

**THEREFORE,** Plaintiff requests judgement against defendant for damages in a sum within the jurisdictional limits of this Court, together with costs of suit, and any further relief as the Court deems proper.

For the reasons set forth above, it is respectfully submitted that this Court should hold that Congress' legislation authorizing the U.S. Patent and Trademark Office to collect maintenance fees and having the Patent **lapse** is unconstitutional and results in the taking of personal property without compensation.  Teresa Lucree, et al. pray that this court grant this relief along with damages and any other relief that it deems just and proper.

The Court is authorized to award the damages received as a contribution to the USPTO.

Respectfully submitted,

Frank A. Lukasik, J.D.

1550 KIllingsworth Way, Apt. 24

The Villages, FL 32162

352 674-3637

13

# United States Patent and Trademark Office OG Notices: 21 December 2004

Notice of Expiration of Patents
Due to Failure to Pay Maintenance Fee

35 U.S.C. 41 and 37 CFR 1.362(g) provide that if the required maintenance fee and any applicable surcharge are not paid in a patent requiring such payment, the patent will expire at the end of the 4th, 8th or 12th anniversary of the grant of the patent depending on the first maintenance fee which was not paid.

According to the records of the Office, the patents listed below have expired due to failure to pay the required maintenance fee and any applicable surcharge.

PATENTS WHICH EXPIRED ON October 27, 2004
DUE TO FAILURE TO PAY MAINTENANCE FEES

| Patent Number | Application Number | Issue Date |
|---|---|---|
| 5,157,793 | 07/765,895 | 10/27/92 |
| 5,157,812 | 07/722,705 | 10/27/92 |
| 5,157,814 | 07/762,833 | 10/27/92 |
| 5,157,823 | 07/592,523 | 10/27/92 |
| 5,157,825 | 07/557,644 | 10/27/92 |
| 5,157,834 | 07/507,425 | 10/27/92 |
| 5,157,837 | 07/634,437 | 10/27/92 |
| 5,157,839 | 07/715,432 | 10/27/92 |
| 5,157,848 | 07/646,216 | 10/27/92 |
| 5,157,862 | 07/755,538 | 10/27/92 |
| 5,157,877 | 07/841,473 | 10/27/92 |
| 5,157,878 | 07/839,702 | 10/27/92 |
| 5,157,881 | 07/709,171 | 10/27/92 |
| 5,157,884 | 07/689,653 | 10/27/92 |
| 5,157,892 | 07/796,921 | 10/27/92 |
| 5,157,895 | 07/633,221 | 10/27/92 |
| 5,157,901 | 07/663,167 | 10/27/92 |
| 5,157,902 | 07/706,032 | 10/27/92 |
| 5,157,904 | 07/694,922 | 10/27/92 |
| 5,157,913 | 07/839,579 | 10/27/92 |
| 5,157,920 | 07/778,086 | 10/27/92 |
| 5,157,925 | 07/755,656 | 10/27/92 |
| 5,157,927 | 07/673,518 | 10/27/92 |
| 5,157,930 | 07/688,973 | 10/27/92 |
| 5,157,935 | 07/748,158 | 10/27/92 |
| 5,157,939 | 07/458,670 | 10/27/92 |
| 5,157,943 | 07/821,317 | 10/27/92 |
| 5,157,952 | 07/735,263 | 10/27/92 |
| 5,157,955 | 07/659,358 | 10/27/92 |
| 5,157,956 | 07/854,766 | 10/27/92 |
| 5,157,957 | 07/437,623 | 10/27/92 |
| 5,157,961 | 07/721,074 | 10/27/92 |
| 5,157,969 | 07/443,112 | 10/27/92 |
| 5,157,974 | 07/719,802 | 10/27/92 |
| 5,157,976 | 07/741,218 | 10/27/92 |
| 5,157,979 | 07/782,346 | 10/27/92 |
| 5,157,983 | 07/667,205 | 10/27/92 |
| 5,157,984 | 07/612,701 | 10/27/92 |

ATTACH. 1

Frank A. Lukasik

COPIES: Elizabeth Dole; Senator Orrin Hatch; Congressman John Kasich

### 1998
### SMALL BUSINESS

| | | |
|---|---|---|
| APPLICATIONS FILED | 69,204 | |
| PATENTS ISSUED | 40,522 | |
| **MAINTENANCE FEES** | **FEES PAID** | **SURVIVED** |
| First Stage  (3.5 yrs.) 20,118 @ $525 | | 50% |
| Second Stage (7.5 yrs.) 10,915 @ $1,050 | | 27% |
| Third Stage (11.5 Yrs.) 4,797 @ $1,580 | | 12% |

### LARGE BUSINESS

| | | |
|---|---|---|
| **APPLICATIONS FILED** | **161,171** | |
| **PATENTS ISSUED** | **102,983** | |
| **MAINTENANCE FEES** | **FEES PAID** | **SURVIVED** |
| First Stage (3.5 yrs.) 63,786 @ $1,050 | | 62% |
| Second Stage (7.5 yrs.) 40,865 @ $2,100 | | 40% |
| Third Stage | (11.5 yrs.) 22,948 @ $3,160 | 22% |

| | | |
|---|---|---|
| SMALL BUSINESS PATENTS | 40,522 | Full Term 4,797 |
| LARGE BUSINESS PATENTS | 102,983 | Full Term 22,948 |
| TOTAL PATENTS | 143,505 | Full Term 27,745 |
| PERCENTAGE OF SURVIVING PATENTS = | 19% | Seventeen Year Term |

< Print this Window >
<Back>

@ 1998-2006; Professional's Papers Section – 1800miti.Com, Inc.

ATTACH 2.

PREPARED REMARKS OF

James E. Rogan

Prepared Remarks of

JAMES E. ROGAN

Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office

at the

Hearings on
Competition and Intellectual Property Law and Policy
in the Knowledge-Based Economy

February 6, 2002

---

I want to thank my good friend, Chairman Tim Muris, for inviting me to participate in these proceedings today, and to acknowledge both him and Assistant Attorney General Charles James for convening these important hearings.

The USPTO welcomes the FTC and the Department of Justice's desire to air a greater understanding of the patent system. Until recently, patent law was regarded as an esoteric field, understood and navigated by a relative few. It held, at best, a marginal place in law school curricula.

Today, both practitioners and law schools know differently, and the FTC and DOJ are to be applauded for helping to create a better understanding of intellectual property rights. In attempting to regulate certain economic relations, a greater appreciation of intellectual property will prevent against the unintentional consequence of stifling the very innovation and competition they seek to encourage.

***

The USPTO is the Federal Government's tangible expression of commitment to invention and creativity. This commitment goes back to the first days of our republic. Our Founders recognized the importance of patents and copyrights in encouraging research and innovation. In drafting the framework for the United States, they placed into the Constitution in Article I, Section 8, the authority for Congress "[t]o promote the Progress of Science and useful Arts, by securing for limited times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."

For over two centuries our Nation has remained deeply committed to that vision. The Founders understood that a property interest granted to inventors and creators, for a limited period, would create the incentive for innovation to propel us from a small, agrarian colony into an advanced and prosperous country.

The FTC and the Antitrust Division today undertake their missions in an economy in which intellectual property-based enterprises play a leading role.

During my service as an elected official, I saw that vision in action. With the decline of defense spending at the end of the Cold War, the economy of my home state of California came close to depression: some 700,000 jobs were lost with the exodus of defense-related jobs and the ensuing recession.

Yet in a few short years, California rebounded dramatically. All of those lost jobs were recovered -- and more. But they did not come from defense-based industries: they came from industries based on investment in intellectual property. Today, California continues to lead the nation toward a knowledge-based economy.

The understanding of the patent system begins with the recognition that patents are a form of property anticipated by the United States Constitution. The supposed tension between intellectual property law and antitrust law arises, I suspect, from a misunderstanding of patents as a form of monopoly. Although a patent allows an inventor to exclude others from using or selling the invention without permission, it is not a monopoly in the antitrust sense.

While patents can encourage risk-taking and investment in new ideas, patent law also limits the advantage that a patent confers. An inventor does not have exclusive rights to his invention forever. Once the term of the patent expires, the invention is in the public domain and may be used or manufactured by anyone. This term limit also creates incentives for patent holders not to rest on their laurels: they must continue to innovate, since the advantage of patent protection is temporary.

In granting an inventor a temporary patent, the public is given permanent and valuable consideration. In exchange for the limited grant, inventors must fully disclose their invention for all the world to see, study, replicate, and make improvements thereon. The patent must describe and disclose the invention so completely that it would allow someone of ordinary skill in the art to replicate the invention without difficulty.

This is a remarkable trade-off. It is analogous to asking a business to teach its competitors how to use the latest, most cutting-edge technology. This disclosure requirement is all the more stunning when one considers it also allows a competitor to see where the competition's research may take them in the future.

It is highly unlikely that businesses ordinarily would open such windows into their research and development without obtaining a valuable right in exchange. Under our patent system, that which might forever remain locked up as a trade secret is now open for inspection. In analyzing the economic effects of the patent system, commentators often ignore this *quid pro quo* that society obtains from inventors in exchange for the temporary patent grant.

The Patent Act also encourages the disclosure of secret information in another way. It creates an incentive for inventors and businesses to publish their new technologies early, even if they do not intend to patent them, since the printed publication of an invention can disqualify another who might independently arrive at the same discovery from obtaining exclusive patents rights for it in the United States. The FTC has previously noted the importance to competition of having policies that encourage disclosure of research. I trust these hearings will highlight the important role that the Patent Act obviously plays in advancing that policy.

\*\*\*

A patent is not simply a grant of economic advantage, nor is it a form of economic regulation. A patent must be earned through the satisfaction of objective criteria, as well as by appropriate disclosure of the innovation. When an inventor applies to the USPTO for a patent, the application is examined to ensure that under the Patent Act the claimed invention is new, useful and non-obvious when measured against all previous inventions.

Patent examination does not include an analysis of the potential commercial impact of a patent. Patent examination does not determine the relevant market in which the invention may be marketed or sold. No patent examiner projects the economies of scale to be achieved through the invention. Patent examiners, in considering the breadth of claims, are guided by the principle that a patentee's rights are limited only by the ability to make a fully enabling disclosure of the invention, to provide an adequate written description of the invention, to demonstrate the utility of the invention, and to show the invention is novel and non-obvious in view of what we call the "prior art."

An innovator in a new area of technology may gain what is called a "pioneer patent" that provides broad rights. There is nothing new, nor should there be anything unsettling, about this. The history of patents, and that of America, is replete with examples of inventions that broke new ground. From the telephone to the Internet, from automobiles to plastics, the issuance of patents has not impeded the development of new technologies and resulting industries, despite initial protests that issuance of a

patent would decimate innovation and competition.

Although patent law and competition law are not universally congruent, they are highly compatible and serve many similar ends.

To the extent that the Patent Act and antitrust laws are based on dissimilar policies, competition regulators are rightfully cautious in assuming that Congress automatically intends the distinctive policies of antitrust laws to trump those underlying the intellectual property system. This is especially so when one contemplates that the foundations for intellectual property protections are found directly in the United States Constitution. These hearings rightfully reflect that caution, as well as the FTC and Justice Department's recognition of the growing importance of intellectual property rights in the U.S. economy.

Over the last two decades, our three agencies have helped work within the framework of the patent system to facilitate innovation and productivity in the American economy. For instance, licensing guidelines that the FTC and DOJ promulgated in the 1980s helped articulate a balanced view of the value of patent rights. That development allowed creative and inventive enterprises to increasingly see patents not merely as tools for protecting their product market, but as valuable assets that serve broader economic purposes. Based on the value of these assets, a proliferation of start-up firms in the last decade received financing even before they had products to sell.

Today, established firms, and in particular universities, now have increasing incentives to look for others who can use their patented technologies in order to maximize return on their intellectual property. In contrast, a return by competition regulators to viewing IP rights with a 1970s-era suspicion would risk interfering with these market-based incentives to innovate.

***

Several independent developments in the last twenty years also have affected patent policy. One was the establishment of the Court of Appeals for the Federal Circuit. The existence of a court of national jurisdiction for cases involving patents has been an invaluable tool. By reducing the jurisdictional conflicts that had preceded the court's formation, the Federal Circuit has made for a more stable patent system.

The USPTO now has a more coherent body of law against which to judge applications for patents, and inventors have a more assured basis for making judgments on filings.

Patent litigators have a greater ability to anticipate the issues that will be raised in cases concerning whether patents are valid and infringed. This stability has helped contribute to enhancing the value of patent rights as an engine of progress.

Another development has been the expansion of the subject matter of patents. Whenever new technologies are presented for patenting, such as with microorganisms or computer software, the entry of patent law into these areas was greeted with predictions of disaster. Yet today the United States is the international leader in these and all other technological areas.

Further, the United States has made it a key part of its trade policy to create international frameworks for recognizing intellectual property rights. Agreements negotiated through WIPO and the WTO have enhanced the ability of American inventors and holders of intellectual property rights to obtain and enforce parallel rights abroad.

In short, over the past two decades the value of patents as business portfolio assets has increased, their validity has become more predictable, and the areas in which patents could be obtained have expanded. Each of these developments enhances the usefulness of patent law as a motivator for innovation. This is reflected in today's unprecedented explosion of patent applications.

There are some who regard the increase in patent filings with suspicion. The USPTO regards this

growth with mixed emotions. For a number of years, the USPTO has been engaged in what sometimes seems an epic struggle to muster sufficient resources to provide the timely and quality service our customers need. But we remain confident that the growth in patent applications is a boon for America's economy, as well as contributing to our genius for innovation.

Looking across the world we see a high correlation between a country's economic strength and the vitality of its patent system. No single cause explains economic growth, but neither is it an accident nor coincidence that the United States stands at the top of both lists.

***

Once again, I thank Chairman Muris for his gracious invitation to participate here today. In accepting the invitation, I committed our agency to helping these hearings facilitate a full discussion on the issues surrounding the interplay of intellectual property and antitrust policy. We look forward to assisting both the Commission and the Department of Justice in gathering whatever information they need to make sound policy decisions in today's knowledge-based economy.

(2) STUDY

TESTIMONY OF

Nathan P. Myhrvoid

Testimony of

Nathan P. Myhrvold
Chief Executive Officer
Intellectual Ventures

PMB 502, 227 Bellevue Way
Bellevue, WA 98004-5721
(425) 467-2300
http://www.intellectualventures.com/home/

"Patent Quality and Improvement" before the
Subcommittee on the Courts, the Internet and Intellectual Property,
Committee on the Judiciary, House of Representatives, Congress of the United States
28 April 2005

Mr. Chairman and members of the Subcommittee, my name is Nathan Myhrvold. I am very pleased to have been asked to share my views as a scientist and inventor on the patent system with the Subcommittee. My personal history is very relevant to my remarks today, so permit me to introduce myself.

Background

As long as I can remember I have been fascinated with science and technology. I pursued science in school, earning a bachelor's degree in mathematics, and master's degree in geophysics and space physics, both from UCLA. I continued exploring other disciplines, getting another master's degree in mathematical economics and a PhD in mathematical physics from Princeton University. I would have finished school much earlier if I had focused on one topic, but to be honest I never met a kind of science I didn't like. This obsession with schooling might have consumed half my life, but for the fact that I started early, entering college at 14, and completing my PhD by age 23.

After Princeton I was hired by Cambridge University in England, working directly for Professor Stephen Hawking. My research area was quantum field theory in curved space time, perhaps one of the most obscure and esoteric scientific disciplines. At that point in my life I would have told you that I'd be an academic researcher. But life has a way of throwing us curve balls. I took a three month leave of absence from working with Hawking to go to the San Francisco Bay Area to help some friends from graduate school on a software project. Before I knew it I was caught up in entrepreneurial fever.

The year was 1984, and the software industry was still tiny. I became the CEO of Dynamical Systems, a software start up with less than a dozen full time employees. After two years of struggling to keep our heads above water, we were acquired by Microsoft. I spent the next 14 years as a Microsoft employee, reporting directly to Bill Gates as Microsoft's first Chief Technology Officer. I could scarcely believe that I went from esoteric theories in physics to what would become the largest software company in the world.

At Microsoft I championed the development of new technology. Microsoft had zero patents and just two patent applications at the time I joined the company. I advocated increases in R&D spending, and patent filing, greatly increasing each of these. In 1991 I convinced the Microsoft board of directors to start Microsoft Research, the first major industrial research lab to be started in more than a generation. Laboratories like Bell Laboratories, GE Research Labs, Xerox PARC, and IBM Research, have made a tremendous contribution to America's preeminence in science and technology. Unfortunately, these institutions were founded 30 to 100 years ago, and there aren't many recent examples. Very few of the new giants of technology have bothered to invest in research and create similar research organizations. Microsoft Research now employs over 700 researchers in seven laboratories, and is ranked as one of the leading research institutions in the world.

I retired from Microsoft in 2000, and founded Intellectual Ventures, a company dedicated to investing in innovation and creativity in the form of invention. The venture capital community exists to help entrepreneurs start and finance new companies – at Intellectual Ventures we help and finance inventors to invent. This includes both full time employees, as well as working with inventors who are university professors, academic researchers, small

businesses that cannot afford to patent without help, as well as independent inventors. I meet frequently with inventors from all ranks, and have attached a recent speech on invention given at Princeton University. Our company provides both business expertise and financing to these inventors, and provides inventors with a healthy share of the profits in their inventions.

My business career as a corporate executive has focused on managing innovation and using patents as a business asset. However, I am also an inventor with 17 issued US patents. I'm working on increasing that number; for the last couple years I have filed over a dozen patent applications a year which are still pending in the Patent Office. So, in addition to using patents in business, I am also a customer of the Patent Office and have seen the details of the patent process up close.

Given my varied career, I have seen the patent system from the perspectives of pure academic research, a giant technology company, and finally that of a small business. Each perspective offers different views on the patent system. The Subcommittee will hear from people in many of these directly through the process of these hearings. What I can offer is the views of someone who has experienced all of them.

Patents: Protecting Inventions

The patent system is a fundamental foundation of America's innovation based economy. Like any other part of the free enterprise system, the patent system offers economic incentive by allowing private ownership. In a way, this is no different than real estate, or other private assets. Private ownership of valuable assets is the basis for the American economy.

The process of invention requires large amounts of the inventor's time, energy and money. In order to create incentive for that expenditure, the inventor gets ownership in the invention for a limited time, after which it passes into the public domain. This system has been a primary driver behind the tide of innovation that has kept America number one in the world for at least the last century. The system that encouraged and sustained great inventors like Thomas Edison, Alexander Graham Bell and the Wright brothers is a critical component of America's 21st Century goals to lead the world in computing, biotechnology, nanotechnology and dozens of other exciting fields.

Small Inventors: America's Economic Engine

The leading component of America's invention output is driven by individual inventors, academic institutions, and small and medium businesses. The Subcommittee has heard testimony from large technology companies, and their trade associations. These firms are important inventors, and they frequently lead the list in terms of sheer number of patents. However what is much less well known is the substantial role that the little guy plays.

According to US Patent Office records, 45% of American patent holders are classified as "small entities" which includes small businesses, universities and individuals.

This pattern is repeated if you look in particular technology areas. I have done empirical research to understand the nature of the invention process, and found some remarkable results. It is not surprising that the entities that hold the most patents on computer processors include corporations like Intel and IBM. However, if you add them up, universities, individuals and small businesses in aggregate have substantially more processor patents than Intel or IBM – indeed more than the two combined. The same pattern is found in every technology field where I have looked. Small inventors have more operating system patents than Microsoft, more networking patents than Cisco and more wireless patents than Qualcomm.

The typical pattern in a technology field is that the top company (or even the sum of the top five or ten companies) has only a small fraction of the patents in that field – often no more than 10% of the patents. Most invention is not done by the largest companies in the field. Invention occurs across the whole spectrum of the economy – from technology giants all the way down to the lone inventor in the garage. Those lone inventors aren't just working on low-tech areas – no matter how technical a field, a huge number of patents are held by private individuals. Critics of the patent system sometimes talk derisively about the "myth of the small inventor", ignoring their contribution. Well, I am here to tell you that small inventors are not only alive and well, but they actually contribute more inventions than the biggest corporations do.

I think that it is very important for the Subcommittee to appreciate the role that small inventors play when considering reforms to the patent system. This is because small inventors depend on the patent system far more than big companies do. The patent system is the only means for the small inventor to get a fair shake, and any semblance of a level playing field.

A large company has financial resources that a small inventor can only dream of. They also have the ability to extract value from their patents a variety of ways. Indeed many large companies use their patents only on a defensive basis – that is a polite way to say that they use their patents to maintain their dominant market positions, rather than actively use them as revenue generators in their own right.

## Protecting the Small Inventor's Rights

A small inventor, on the other hand, depends almost totally on the patent system to secure his ownership rights in the invention. A small change to patent law can, as an unintended consequence, have catastrophic effects on a small inventor who depends totally on his or her patent rights to survive. A small inventor does not have huge market share and other business assets to fall back on. Worse yet, the small inventor almost invariably winds up competing with large, well funded companies that have every possible advantage. Only the patent system stands tall as the protector of the basic rights of small inventors.

Changes to patent law must be scrutinized carefully to make sure that they do not tilt the playing field in a way that further disadvantages small inventors. They do the bulk of America's inventing and they deserve our support.

## Proposed Patent Reform

I applaud the Subcommittee for its interest in patent reform and I have studied the Committee Print. There are a number of needed reforms that I agree with. In the interests of being concise I will focus here on the most important areas where I think your efforts can be improved, at least from my perspective.

First, I have to be frank and say I am disappointed that there isn't more focus on what I think is the most important aspect of patent quality – namely improving the quality of the patent examination process. Most of the committee print covers rules about patent disputes, and does not address the issues with getting patents examined in the first place. Patent quality starts in the Patent Office itself.

Anybody who is a big customer of the Patent Office, as I am, can tell you that they need some help. The backlog of patents has grown larger, and the waiting time to get a patent has grown with the backlog. Longer waiting is not a recipe for success in a world where the pace of technology is going faster, not slower. Looking ahead, the Patent Office must continue to hire and train new examiners, and keep up with the pace at which invention occurs. This job isn't getting any easier. Many of the proposals in the committee print are likely to increase the burden on the Patent Office. For example, the post-issuance oppositions with discovery will add process and personnel demands.

Simply put, the Patent Office needs adequate resources to do its job. Until the Patent Office is funded adequately to meet the demand for patents, America's inventors are going to be poorly served. I know that funding is a major occupation of Congress, which cuts across many issues including this one. However, without adequate resources, the Patent Office will be stuck in a situation where patent fees continue to rise, as they did last year, without the service improving. This amounts to a hidden tax on innovation. Is that really what serves America best as we enter the 21st Century?

In fairness, I can't complain about the resources without adding that I think the Patent Office does a good job within the constraints it has. Some critics of the patent system like to point to silly sounding patents, like a recent case mentioned in the press of a patent on a peanut butter and jelly sandwich. Or, critics will claim that the patent system is "out of control" and argue that there are many bad patents. These claims are misleading.

Though some bad patents are inevitable, the vast majority of all patents are sound and valid. No serious observer of the patent system has reached any other conclusion. As one example, when patents are re-examined by the Patent Office, the majority of the patents survive all or in part. This is also true in litigation results – there is no data on patents being found invalid en masse in the courts.

It is true that there are also some pretty frivolous sounding patents – indeed there are web sites that feature them, like www.patentlysilly.com. Looking at such a site it becomes obvious that the creativity of American inventors covers the full range from the sublime to the ridiculous, but that can leave the wrong impression. Most patents are both serious and valid.

Another area where misconceptions are bandied about is the topic of patent litigation. In a perfect world, property rights would always be respected, but here on Earth disputes are an inevitable reality. Many critics of the patent system wax hyperbolically about an "explosion" or "epidemic" in patent litigation. While it is true patent litigation has risen in recent years, these critics aren't telling the whole story. For example, the number of patent lawsuits

# In the United States Court of Federal Claims

No. 14-308C

(Filed: July 31, 2014)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| **TERESA NAN LUCREE,** ) | Challenge to Congress's authority to |
| ) | impose patent maintenance fees under the |
| ) | Intellectual Property Clause of the |
| **Plaintiff,** ) | Constitution, art. I, § 8, cl. 8; claim akin to |
| ) | illegal exaction; takings claim |
| **v.** ) | |
| ) | |
| **UNITED STATES,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Frank A. Lukasik, The Villages, Florida, for plaintiff.

Sonia M. Orfield, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs were Stuart F. Delery, Assistant Attorney General, Civil Division, Robert E. Kirschman, Jr., Director, and Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel were Heidi Bourgeois, Office of General Law, and William LaMarca, Office of the Solicitor, United States Patent and Trademark Office, Alexandria, Virginia.

## OPINION AND ORDER

LETTOW, Judge.

Plaintiff Teresa Nan Lucree seeks to recover damages from the United States for the early expiration of her patent in 2010, which resulted from her failure to pay statutorily-mandated maintenance fees.[1] In her complaint, Ms. Lucree challenges Congress's authority to impose

---

[1]The complaint, filed April 16, 2014, lists nine additional individuals as "party or amicus" in this case, each of whom supposedly had patents that also expired as a result of unpaid maintenance fees. Joinder of these individuals would be improper under the terms of Rule 20(a) of the Rules of the Court of Federal Claims ("RCFC"). Although "[m]isjoinder of parties is not a ground for dismissing an action," RCFC 21, these other persons would not have a claim cognizable in this court. Each of the other individuals' patents expired between 1998 and 2006, putting their claims outside the six-year statute of limitations for actions commenced against the

maintenance fees and argues that the practice results in an illegal exaction and a taking of private property without compensation in contravention of the Fifth Amendment to the United States Constitution. Pending before the court is the government's motion to dismiss Ms. Lucree's complaint pursuant to RCFC 12(b)(6). For the reasons stated, the government's motion is GRANTED.

## BACKGROUND

In the course of applying for and securing a patent, applicants must pay several fees, including filing fees, issue fees, and maintenance fees. *See* 35 U.S.C. § 41.[2] Of relevance here, patent holders must pay maintenance fees to the United States Patent and Trademark Office ("USPTO") three times during the lives of their issued patents to keep them in force. *Id.* § 41(b)(1) ("The [USPTO] Director shall charge . . . fees for maintaining in force all patents . . . [at] [t]hree years and 6 months after grant, . . . [at] [s]even years and 6 months after grant, . . . [and at] [e]leven years and 6 months after grant."). If a patent holder fails to pay maintenance fees within six months of the statutory deadlines, their pertinent patent expires. *Id.* § 41(b)(2).[3]

Ms. Lucree paid the first and second required maintenance fees for her patent, U.S. Patent No. 5,791,732 (filed May 19, 1997) (issued Aug. 11, 1998), but failed to pay the third and final fee, resulting in the patent's expiration on August 11, 2010, after a six-month grace period, eight years earlier than anticipated. *See* Compl. at 3-4; 1358 Off. Gaz. Pat. & Trademark Office No. 4 (Sept. 28, 2010). Ms. Lucree made no attempt to dispute her nonpayment or to seek a revival of her patent. *See* Def.'s Mot. at 4. Rather, she filed suit in this court, challenging the constitutionality of maintenance fees and Congress's ability to attach conditions to patents that have been issued. Compl. at 12, 16. She contends that such conditions violate the property interests of patent holders in their patents by enabling the government to take their patents before their expiration date and place them in the public domain. *Id.* at 16.

The government seeks dismissal of Ms. Lucree's complaint on the ground that Congress's well-settled authority to legislate patent fee requirements renders post-issuance conditions, such as maintenance fees, constitutional. Def.'s Mot. at 5-7. In the government's view, because conditions are permissible, there is no taking when patents expire due to unpaid maintenance fees. *Id.* at 7-8 ("Ms. Lucree had no property to be taken once the patent lapsed due to nonpayment of the maintenance fees."). Ms. Lucree accepts Congress's general authority to impose conditions on patents but contends that Congress exceeded its authority by requiring

---

United States. 28 U.S.C. § 2501. Consequently, the claims of the other nine individuals are dismissed, and the court will treat Ms. Lucree as the sole plaintiff.

[2]Filing fees are prescribed in 35 U.S.C. § 41(a). Other provisions of Section 41 specify examination fees, issue fees, appeal fees, revival fees, and maintenance fees, among others. *See Id.* § 41(a)(3), (4), (6), (7) and (b). Fees are reduced for small businesses. *See id.* § 41(h).

[3]"The Director may accept the payment of any maintenance fee required by subsection (b) after the 6-month grace period if the delay is shown to the satisfaction of the Director to have been unintentional." 35 U.S.C. § 41(c)(1). In such cases, patents are "revived" and a revival fee is due. *Id.* § 41(a)(7); *see also* Def.'s Mot. to Dismiss ("Def.'s Mot.") at 4, ECF No. 5.

maintenance fees. *See* Reply Brief of Teresa Nan Lucree ("Pl.'s Opp'n") at 5, 10, ECF No. 6. Maintenance fee requirements, she contends, improperly adopt a European approach to patent law that allows the government to take the personal property of patent-holders who fail to pay additional fees on property that they own. *Id*. at 8-10, 12.

## JURISDICTION

This court has jurisdiction over Ms. Lucree's claims pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), which grants the Court of Federal Claims "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Nonetheless, the Tucker Act does not create a substantive right to monetary relief. *United States v. Testan*, 424 U.S. 392, 398 (1976). Rather, a plaintiff must point to an additional source of law that mandates compensation by the federal government for any damages sustained. *United States v. Mitchell*, 463 U.S. 206, 216-17 (1983) (citing *Testan*, 424 U.S. at 400). Here, Ms. Lucree seeks relief for the early expiration of her patent under the Fifth Amendment's takings clause, which prohibits "private property [from] be[ing] taken for public use, without just compensation." U.S. Const. amend. V. A claim for just compensation is a claim for money damages cognizable under the Tucker Act. *Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1, 11-13 (1990); *Narramore v. United States*, 960 F.2d 1048, 1051 (Fed. Cir. 1992). Ms. Lucree's challenge to the constitutionality of the maintenance-fee provisions of 35 U.S.C. § 41 also implicitly raises a claim of an illegal exaction, *i.e.*, to recover money improperly paid, exacted, or taken from her in contravention of the Constitution when she paid the first two maintenance fees that were due under 35 U.S.C. § 41(b). A claim based upon an illegal exaction pursuant to an asserted statutory power may be maintained under the Tucker Act. *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572-73 (Fed. Cir. 1996); *Eastport S. S. Corp. v. United States*, 372 F.2d 1002, 1007-08 (Ct. Cl. 1967); *see also Figueroa v. United States*, 466 F.3d 1023, 1029 (Fed. Cir. 2006) (ruling that a patent holder had standing to challenge the legality of patent fees that he had paid).

## STANDARD FOR DECISION

To avoid dismissal under RCFC 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, that states a plausible claim for relief. *See Connolly-Lohr v. United States*, 112 Fed. Cl. 350, 352 (2013) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). When considering a motion to dismiss under RCFC 12(b)(6), courts must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the pleader's favor. *Perez v. United States*, 156 F.3d 1366, 1370 (Fed. Cir. 1998). If the facts alleged in the complaint do not entitle the plaintiff to a legal remedy, the complaint may be dismissed for failure to state a claim upon which relief can be granted. *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1131 (Fed. Cir. 1998); *Connolly-Lohr*, 112 Fed. Cl. at 352 (citing RCFC 12(b)(6)).

## ANALYSIS

### A. Constitutionality of Maintenance Fees

The Constitution grants Congress the power "to promote the progress of science and useful arts by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." U.S. Const. art I, § 8, cl. 8. Ms. Lucree concedes that the Intellectual Property Clause authorizes Congress to impose conditions on patent applications, but she contends that it does not empower Congress to place conditions on patents after they have been issued. Compl. at 12. She argues that post-issuance conditions like maintenance fees are unconstitutional because they are derived from European patent laws rather than the Constitution,[4] and because they detract, rather than promote, scientific progress by burdening patent applicants with added costs and the threat of early expiration for nonpayment. *See* Compl. at 9-16; *see also* Pl.'s Opp'n at 6-8.[5]

The government avouches that "'maintenance fees and the patent system put in place by Congress . . . do not conflict with the Constitution.'" Def.'s Mot. at 6 (quoting *Korsinsky v. Dudas*, 227 Fed. Appx. 891, 894 (Fed. Cir. 2007)). Rather, the Constitution grants Congress discretion to determine which patent policies and practices will best promote scientific progress. *Id*. at 5 ("'[T]he powers of Congress to legislate on the subject of patents is plenary by the terms of the Constitution.'") (quoting *McClurg v. Kingsland*, 42 U.S. (1 How.) 202, 206 (1843)). The right to a patent, the government contends, is statutory, and Congress is constitutionally authorized to impose monetary conditions on it. *Id*. at 5-6 (citing *Graham v. John Deere Co.*, 383 U.S. 1, 6 (1966); *Boyden v. Commissioner of Patents*, 441 F.2d 1041, 1043-44 (D.C. Cir. 1971); and *Giuliani v. United States*, No. 88-00287 ACK, 1988 WL 97455, at *1 (D. Haw. Aug. 1, 1988), *aff'd*, 878 F.2d 1444 (Fed. Cir. 1989)).

---

[4]Ms. Lucree contends that Congress adopted the Paris Convention, not the United States Constitution, as its guide for patent legislation, Pl.'s Opp'n at 5, and based its authority to prescribe maintenance fees on the "European Method," *id.* at 9.

[5]Ms. Lucree also posits two additional arguments for the unconstitutionality of maintenance fees. First, she argues that maintenance fees impermissibly impose additional requirements on patentees, *i.e.*, entrepreneurship and commercial success. Pl.'s Opp'n at 7-8. However, as the government notes, all patentees are required to pay maintenance fees, regardless of the commercial value of their patents. Def.'s Mot. at 7 n.5. It is up to the patent-holder to decide whether the patent is worth maintaining. *Id*. Thus, while maintenance fees force patent-holders to make a choice, they do not bind them to any additional requirements apart from payment of the specified fee, rendering Ms. Lucree's argument unpersuasive.

Second, she argues that maintenance fees are unconstitutional because the fees are used to pay the expenses of future applications by the Patent Office, which Ms. Lucree alleges is on a self-sustaining budget. Compl. at 17. This argument also is without merit. "Congress'[s] determination of federal spending priorities and how the patent system fits into national economic development goals is an eminently rational exercise of its power." *Figueroa v. United States*, 66 Fed. Cl. 139, 152 (2005), *aff'd*, 466 F.3d 1023.

Given the broad terms of the Intellectual Property Clause of the Constitution, any condition Congress imposes on patents need only be rationally related to the promotion of progress in science and the useful arts to survive judicial scrutiny. *Figueroa*, 66 Fed. Cl. at 152. While Ms. Lucree contends that Congress's imposition of maintenance fees gives greater prominence to European practice than the terms of the Constitution, and imposes a post-issuance condition on a patent, nothing in the Constitution forecloses Congress from requiring such fees, which rationally relate to the promotion of scientific progress.[6]

## B. Takings

In addition to challenging the constitutionality of maintenance fees, Ms. Lucree contends that Congress's imposition of such fees resulted in an unconstitutional taking of her private property, for which she now seeks just compensation. Compl. at 16.[7] She alleges that she had complied with all of the requirements for patent issuance, giving her a cognizable property right in her patent, independent of any additional post-issuance congressional conditions. Compl. at 17-18. She accordingly avers that she should be compensated for all lost profits incurred by the early expiration of her patent. *Id.* at 21. The government maintains that there is no taking because the patent privilege does not exist independent of congressional conditions, including post-issuance maintenance fees, meaning that Ms. Lucree had no property to be taken by the government after she failed to pay the third installment of those fees. Def.'s Mot. at 7-8.

It is undisputed that Ms. Lucree had a property interest in her patent. That property interest, however, was subject to the terms and conditions set by Congress, including maintenance fees.[8] Because Ms. Lucree did not pay the final maintenance fee due on her patent,

---

[6]Congress explained its adoption of maintenance fees as "ha[ving] the advantage of deferring payment until the invention begins to return revenue to the inventor. Should the invention prove to have no commercial value, the inventor has the option of permitting the patent to lapse, thus avoiding further fees." H.R. Rep. No. 96-1307(I), at 4-5 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6460, 6463-64; *see* Def.'s Mot. at 7 n.5.

[7]Ordinarily, claimants must concede the validity of the government action underlying their takings claims. *See Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 802 (Fed. Cir. 1993). Nonetheless, "[a] claim in our court for just compensation due to a taking is not defeated merely because a property owner believes that the government action that allegedly took his property was for other reasons invalid – or even because he goes so far as to challenge its validity. As the Federal Circuit has explained, 'a court's conclusion that government agents acted unlawfully does not defeat a Tucker Act takings claim if the elements of a taking are otherwise satisfied.'" *Bailey v. United States*, 78 Fed. Cl. 239, 253-54 (2007) (quoting *Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1363 (Fed. Cir. 1998)). Accordingly, Ms. Lucree's takings claim is not precluded by her constitutional challenge.

[8]As the government notes, a similar complaint filed in 2006 was dismissed under Rule 12(b)(6) for failure to state a claim. *See Michels v. United States*, 72 Fed. Cl. 426 (2006). In *Michels*, the court held that Congress had the authority to impose conditions, including maintenance fees, on patents, and that an early expiration of patents due to nonpayment did not

the early expiration of her patent did not constitute a taking by the government, but rather was consequence for her failure to fulfill the requirements upon which her patent was conditioned. These circumstances do not entitle Ms. Lucree to legal relief, and her complaint may be properly dismissed for failure to state a claim.[9]

## CONCLUSION

For the reasons set forth above, the government's motion to dismiss Ms. Lucree's complaint pursuant to RCFC 12(b)(6) is GRANTED.

The clerk shall enter judgment in accord with this disposition.

No costs.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge

---

constitute a taking of property for purposes of the Fifth Amendment. *Id*. at 430 (citing *Figueroa v. United States*, 57 Fed. Cl. 488 (2003)). The court refrained, however, from ruling on the constitutionality of maintenance fees given that it was raised for the first time in the plaintiff's response to the government's motion to dismiss. *Id*. at 431-432. The court in *Michels* nonetheless stated that had the issue been properly pled, it would have failed on the merits. *Id*. at 432.

[9]Ms. Lucree's complaint also challenges the constitutionality of publishing patent applications eighteen months after filing and the Patent Office's transition to the "first to file" system, both of which she contends harm small businesses and independent inventors. Compl. at 18-21. This challenge is hypothetical; Ms. Lucree acknowledges that the "first to file" system is not pertinent to her claims in this action. Compl. 20-21. Consequently, Ms. Lucree fails to establish that she has standing to bring these claims. *See, e.g.*, *Madstad Eng'g, Inc. v. United States Patent & Trademark Office*, __ F.3d __, __, 2014 WL 2938080, at *1, *13 (Fed. Cir. July 1, 2014) (holding that a plaintiff did not have standing to challenge the "first to file" system where its alleged harms were speculative and not actual). Nonetheless, even if standing were found, these claims would fail on the merits, given the court's deference to congressional discretion over patent legislation.